IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTINE MICHELLE PERRY,      )
                               )
            Plaintiff,         )
                               )      No. 12 C 8539
vs.                            )
                               )      Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security,[1]  )
                               )
            Defendant.         )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Christine Michelle Perry seeks reversal and remand of the final decision of the

Commissioner of Social Security ("Commissioner") denying her applications for Supplemental

Security Income ("SSI") and Disability Insurance Benefits ("DIB") (doc. # 15).  The

Commissioner opposes the motion and seeks affirmance of the decision denying benefits (doc. #

23).[3]  For the following reasons, we deny Ms. Perry's motion and affirm the Commissioner's

decision.

## I.

We begin with the procedural history of this case.  Ms. Perry filed for SSI and DIB on

January 20, 2009, alleging that she became unable to work on January 1, 2007 due to various

disabilities (R. 344-50).[4]  Her applications were denied initially and upon reconsideration (R.

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin for Michael J. Astrue as the named defendant.

[2]On December 17, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 7).

[3]Ms. Perry did not file a reply brief and thus waived her right to do so.

[4]Some of Ms. Perry's SSI/DIB application documents list her disability as "paranoid schizophrenic" (R. 193).  However, other documents list "affective/mood disorders" as the primary alleged disability and

182-85, 190-92, 194-95).  Ms. Perry then requested, and was granted, a hearing before an

Administrative Law Judge ("ALJ"), and three separate hearings took place between December 1,

2010 and June 8, 2011 before ALJ Regina Kossek (R. 200-01, 167-76, 116-66, 42-115).  At the

third hearing, Ms. Perry amended her date of onset to January 17, 2008 (R. 46).  The ALJ issued

an opinion denying benefits on July 26, 2011 (R. 23-36).  The Appeals Council then denied Ms.

Perry's request for review, making the ALJ's ruling the final decision of the Commissioner (R.

1-6).  *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record.  Part A briefly sets forth Ms.

Perry's background, followed by her physical health medical record in Part B and her mental

health medical record in Part C.  Part D discusses the testimony provided at three separate

hearings before the ALJ, and Part E sets forth the ALJ's written opinion.  Finally, Part F

discusses information provided to the Appeals Counsel following the ALJ's final determination.

## A.

Ms. Perry was born on July 9, 1971 (R. 344).  She is divorced and has two sons, neither

of whom live with her (R. 141).  During the relevant time period, Ms. Perry often lived with her

mother (R. 137).  She has a high school degree plus several years of college work.[5]  Ms. Perry

worked as a manager at Cash America from 2005 to 2007, but was terminated because her

"Asymptomatic Human Immunodeficiency Virus ("HIV") Infection" as the secondary disability (R. 177-80).  The record contains no evidence of Ms. Perry ever having been definitively diagnosed with schizophrenia and none of the testimony before the ALJ focused on this alleged condition.

[5]The record is inconsistent on this and several other points.  At different times, Ms. Perry stated that she has a high school degree (R. 536), a few years of college (R. 303), or a bachelor's degree (R. 136).  The record also is inconsistent as to whether Ms. Perry ever was married: at one point, Ms. Perry told a therapist at Resurrection Health Care that she had never married (R. 535), yet later informed the same health care provider that she was going through a divorce (R. 431).  She also stated that the Department of Children and Family Services ("DCFS") took her children (R. 433), although she told the ALJ at her second hearing that DCSF was not involved with respect to the custody arrangements of her younger son (R. 143).

employer felt she was "not producing the way [she] was when [she] initially started" (R. 139). Most recently, she worked as a manager at Harvard Collection Services, but again was discharged for lack of productivity (*Id.*). She currently is unemployed and is supported by her mother (R. 137-39). Ms. Perry suffers from depression and HIV and has a history of substance abuse.

**B.**

The medical record begins in early 2008 with a Psychosocial Assessment completed by Resurrection Health Care in connection with the provision of outpatient behavioral health services (R. 535-54). During this initial assessment dated January 19, 2008, Ms. Perry reported to a drug and alcohol counselor that she was seeking treatment for depression and alcohol dependence (R. 551). She informed the counselor that she had never been married, had completed high school, had lost her job, and felt anxious and depressed, all of which led her to drink as a coping mechanism (R. 536, 538). She denied any past drug use (R. 548). Ms. Perry then attended two hospital-based group therapy sessions in February 2008 and shared with the group her struggles to abstain from alcohol (R. 553-54).

On December 30, 2008, Ms. Perry arrived at the emergency room of Saints Mary and Elizabeth Medical Center complaining of abdominal pain and suicidal thoughts (R. 431). The emergency room triage and nursing notes from her admission indicate that Ms. Perry is HIV positive, has a history of substance abuse, felt depressed, was going through a divorce, and had lost custody of her children to the Department of Children and Family Services (R. 431-38). The notes also indicate that Ms. Perry was intoxicated upon her admission and that she tested positive for cannabis (R. 438, 440). She remained hospitalized for 18 days, during which time she received a psychiatric evaluation from Dr. Hisham Sadek (R. 442-43). Dr. Sadek diagnosed Ms.

Perry with "[m]ajor depressive disorder, recurrent and chronic with psychotic features," as well as with alcohol and cannabis use/abuse over a 15 to 20 year period, and he assigned her a GAF score of 30 (*Id.*).[6] He further indicated that Ms. Perry has a history of previous psychiatric hospitalizations for "intense depressive signs and symptoms, feelings of helplessness and hopelessness, thoughts and ideas that life is not worth living, and commanding intentions of self-injurious behavior" (R. 442).[7] Upon discharge, Dr. Sadek instructed Ms. Perry to continue taking her various medications, including Lexapro (antidepressant), Seroquel (antidepressant), Buspar (anti-anxiety), Trazadone (antidepressant), and Campral (alcohol dependence), and to follow-up with him in a few weeks (R. 557).

In the months following Ms. Perry's hospitalization, a host of doctors completed psychiatric evaluations at the request of the Bureau of Disability Determination Services ("DDS"). Dr. Ronald Hershow, Ms. Perry's infectious disease doctor, completed a Psychiatric Report on March 3, 2009 and provided diagnoses of major depressive disorder without psychotic features, HIV, untreated mood and substance abuse issues, divorce, and stress over her HIV status (R. 458-61). He further noted that she had been hospitalized in late 2007 for depression, alcohol abuse/dependence, and suicidal ideation, and he found her to have "serious limitations" with respect to her ability to respond appropriately to supervision, coworkers, and work

---

[6]The Global Assessment of Functioning ("GAF") scale ranges from zero to 100 and is a measure of an individual's "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000). GAF scores of 21-30 indicate that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *Id.* GAF scores of 41-50 indicate "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

[7]There are no medical records reflecting hospitalizations prior to the December 30, 2008 hospitalization.

pressures; to perform tasks on a sustained basis; or to initiate, sustain, or complete a task (R. 460-61).

Dr. Henry Fine completed a Psychiatric Evaluation of Ms. Perry that same month (R. 462-65). In doing so, he reviewed available medical reports and spent 45 minutes with Ms. Perry. Dr. Fine observed her to be neat but unusually dressed (wearing, among other things, different colored gloves, which she kept on during the interview) and having a flat affect (R. 462, 465). He noted that she came to the examination alone via public transportation (R. 462). During the interview, Ms. Perry recounted roughly three psychiatric hospitalizations starting in 2007, the same year she claimed to have received her HIV diagnosis (*Id.*).[8] She described as her main complaints fatigue, lack of motivation, social isolation, crying spells, poor concentration, poor sleep, and weight loss due to her HIV (R. 462-63). Dr. Fine noted that Ms. Perry denied some of the facts charted in the medical record, such as auditory hallucinations and alcohol abuse (R. 465). Finally, Dr. Fine provided diagnoses of HIV, major depression, rule out psychotic features, rule out schizophrenia, and rule out substance abuse and alcohol (*Id.*).

Dr. J.V. Rizzo, a psychologist, completed a Psychiatric Review Technique in April 2009 based on the medical records, the reports of Drs. Hershow and Fine, and the documents Ms. Perry submitted in support of her disability application, including several self-completed functional reports wherein she stated that she is able to care for her children, prepare simple meals, shop for food and clothes, handle money, and attend church, but that she tires easily and needs constant reminding from her mother to take her medications and do "simple things" (R. 377-84). Based on a review of all these documents, Dr. Rizzo concluded that Ms. Perry's impairments do not meet or equal a mental listing as the "sources do not support [the] severity

---

[8]Dr. Hershow's medical notes indicate that Ms. Perry received her HIV diagnosis in 1997 (R. 711). Furthermore, as noted in footnote 7 above, the medical records contain no information pertaining to hospitalizations occurring prior to 2008.

levels reported by [the] claimant" (R. 478). Dr. Rizzo also completed a Mental Residual Functional Capacity Assessment in which he found Ms. Perry to be "markedly limited" in her ability to carry out detailed instructions, and "moderately limited" in her ability to understand and remember detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to be punctual, and to interact appropriately with the general public (R. 480-81). In sum, Dr. Rizzo concluded that Ms. Perry has severe mental impairments and environmental stressors but that "she retains the mental ability to conduct an ordinary range of daily activities" and "is able to carry out simple, unskilled tasks and instructions with ordinary supervision" (R. 482). These findings largely were echoed by DDS physician Dr. Victoria Dow and DDS psychologist Dr. Donna Hudspeth, who opined in July 2009 pursuant to an Illinois Request for Medical Advice that Ms. Perry has the ability to perform unskilled work (R. 507).

On June 4, 2009, Ms. Perry went to the Emergency Room of St. Mary of Nazareth Hospital after taking an overdose of the anti-depressant drug Elavil (R. 491). Ms. Perry complained of feeling depressed and suicidal, and of hearing voices commanding her to harm herself (*Id.*). The psychiatric evaluation from this hospital stay assigned a GAF of 30 and provided diagnoses of major depression with recurrent and chronic suicidal ideation, as well as alcohol and cannabis abuse (R. 491). Ms. Perry remained hospitalized for two days (*Id.*).

On November 5, 2009, Ms. Perry arrived by ambulance at a hospital in Michigan after ingesting opiates and other narcotics (R. 592). Nursing notes from the admission indicate that she swallowed anywhere from four to six Vicodin, half a bottle of Dayquil, and half a pint of vodka (R. 596). She explained that she felt depressed and overwhelmed but denied suicidal ideation (R. 597). Even so, the hospital provided a "suicide risk intervention" by removing her

clothing, belongings, and room equipment, and by placing her near the nursing desk (R. 615). She was discharged the next day (R. 591).

In March 2010, Ms. Perry again presented to the Emergency Room of St. Mary of Nazareth Hospital, this time with feelings of depression, suicidal ideation, paranoia, and commanding thoughts of self-harm (R. 581). During her three-day hospital stay, she tested positive for cannabis (R. 584). Ms. Perry's Psychiatric Discharge Summary assigned her a GAF score of 30 and provided a discharge diagnosis of Major Depressive Disorder, recurrent and chronic, with a history of substance abuse (R. 583).

The record also contains a number of treatment notes from Dr. Sadek pertaining to his treatment of Ms. Perry between February 2009 and February 2011. Unfortunately, many of the records are illegible, although it is possible to make out some of his hand writing. For instance, in an April 6, 2010 notation, Dr. Sadek assigned Ms. Perry a GAF score of 45, listed her diagnosis as "major depression rec[current] chronic severe," and recorded Cymbalta, Ambien, and Seroquel among her medications (R. 665). Further, on June 23, 2010, Dr. Sadek completed a form letter addressed to "To Whom It May Concern" in which he checked a box stating: "My patient is currently not using drugs and/or alcohol and remains disabled" (R. 629). Dr. Sadek also filled-out a Psychiatric/Psychological Impairment Questionnaire on Ms. Perry's behalf on February 15, 2011 (R. 632-39). Here, he noted a current GAF score of 30, a "guarded" prognosis, and clinical findings of disturbances to memory, appetite, mood, and sleep; recurrent panic attacks; anhedonia; feelings of guilt/worthlessness; and suicidal ideation or attempts (R. 633). Dr. Sadek rated her "moderately" or "markedly" limited in numerous categories pertaining to understanding and memory, sustained concentration and persistence, social interactions, and

adaptation (R. 635-37). He noted medications of Cymbalta and Seroquel (R. 637). Finally, he found her incapable of even a "low stress" job due to chronic mental illness (R. 638-39).

## C.

According to the medical notes of infectious disease doctor Ronald Hershow, Ms. Perry received an HIV diagnosis in 1997 and took various HIV medications beginning that year (R. 711). It is unclear when she first began receiving care from Dr. Hershow, but she left his practice in September 2007 and did not return until August 2008, at which time she came in for a check-up (*Id.*). At this appointment, Dr. Hershow listed HIV, marijuana use, alcohol abuse, and depression among Ms. Perry's various problems (*Id.*). Dr. Hershow smelled "noticeable alcohol" on Ms. Perry's breath, and liver function tests performed one week earlier showed markedly elevated levels indicative of alcohol use (*Id.*). Ms. Perry, however, assured him that she had lessened her alcohol intake during the past few months by switching from "hard" to "soft" alcohol (*Id.*). She also told Dr. Hershow that she did not attend Alcoholics Anonymous ("AA") because it was inconvenient, that she was relying instead on a substance abuse counselor, and that she had stopped taking her anti-depressants because she did not like how they made her feel (R. 712). Dr. Hershow encouraged Ms. Perry to re-engage with psychiatric care and to explore AA (*Id.*). He also confronted her on the dangers of alcohol to her liver and to her ability to adhere to her HIV medications (*Id.*).[9]

---

[9]Dr. Hershow worked in tandem with various doctors of pharmacology who assessed and adjusted Ms. Perry's HIV antiretroviral therapy ("ART") based on her liver function tests, as well as genetic tests, and also assisted her in securing medications. One such doctor, Dr. Benjamin Colton (Pharm.D.), observed on September 3, 2008 that Ms. Perry reported periods of non-adherence to her ART during the 2007-08 absence from Dr. Hershow's care, and he also flagged her heightened alcohol use (R. 702). Two years later, Dr. Rodrigo Mauricio Burgos (Pharm.D.) assisted Ms. Perry with her AIDS Drug Assistance Program ("ADAP") application, through which she could secure HIV medications (R. 646). Dr. Burgos indicated that as of September 20, 2010, Ms. Perry still had medication "obtained on her IDPA [Illinois Department of Public Aid] card prior to losing it," although she also was permitted to get HIV medication refills from the infectious disease clinic while awaiting ADAP approval (*Id.*).

Ms. Perry had several follow-up appointments with Dr. Hershow in September 2008. At her first appointment, she reported that she had "a nice visit to Tennessee" and had plans to start school soon (R. 696). She further reported that alcohol counseling conflicted with school and that she believed she could control her alcohol consumption by "keeping busy" and with the help of her mother (*Id.*). Dr. Hershow expressed doubt with these strategies and encouraged other options like AA (*Id.*). He also noted that in 2007, Ms. Perry had a viral load (detectable HIV virus) of less than 50, whereas more recent tests indicated an increase in her viral load to 16,000 (R. 697). The treatment notes from this time period also reflect that Ms. Perry had been told (likely by one of the doctors of pharmacology with whom he worked) to halt her HIV medications due to elevated liver enzymes indicating alcohol use (*Id.*). At a second appointment two weeks later, Ms. Perry told Dr. Hershow of her plans to start school and claimed that she had good control over her alcohol use (R. 700). She also complained of sciatic pain in her right buttock (R. 697).

Between October 2008 and August 2009, Ms. Perry missed four appointments with Dr. Hershow (R. 694, 692, 690, 688). She kept her January 26, 2010 appointment, however, and reported to Dr. Hershow that she had been receiving HIV care at St. Elizabeth's Hospital (R. 685). She reported medication and financial hardships, a weight loss down to 98 pounds (that she rebounded from by regaining 30 pounds by the time of this appointment), and missed doses of her HIV medications (R. 685-86). She also reported increased problems with depression, sciatic pain, three hospitalizations, increased alcohol use, and problems maintaining her HIV treatments due to frequent trips out of state and "alternated living in Chicago and Detroit" (R. 686). She made similar reports during a follow-up visit in March 2010, but this time also reported that she had cut her binge drinking down from one to two times a week to just one, and

that her fiancé helped keep her "in check" (R. 683). She admitted to seeing her psychiatrist at St. Elizabeth's Hospital only infrequently and felt her depression was not improving (R. 684). Dr. Hershow urged her to discuss her frustrations with her therapist and to continue with treatment (*Id.*). Ms. Perry then missed two April appointments but kept an April 27, 2010 appointment during which she reported that her depression had lessened, that she had made strides in decreasing her alcohol intake, and that she had gotten engaged (R. 675). She also stated that she was continuing with psychiatric care at St. Elizabeth's Hospital (*Id.*). Dr. Hershow observed that she was "notably improved today in mood and affect" and that her sciatica was "quiescent" (R. 676).

On November 23, 2010, following a seven-month hiatus that included missed visits, Dr. Hershow re-examined Ms. Perry (R. 647-48). She reported abstention from alcohol but worsening depression, crying spells, non-adherence to psychiatric care visits and her HIV medications due to the loss of her medical card, as well as family troubles—her mother had asked her to move out and she had lost contact with her children (R. 648). Dr. Hershow's notes reveal that he doubted Ms. Perry's abstinence or her adherence to psychiatric medications (R. 650). Dr. Hershow reported that Ms. Perry had not taken her HIV medications for eight months and had significantly elevated blood pressure, stress headaches, and a slight weight loss (R. 649-50). He stated that "depression remains a major issue and patient has had numerous recent hospitalizations for depressive episodes and suicide attempts" (R. 650). Dr. Hershow then completed an AIDS/HIV Impairment Questionnaire ("HIV Questionnaire") in which he diagnosed Ms. Perry with an on-going HIV-infection, depression, hypertension, a history of alcohol abuse, and a "guarded" prognosis (R. 511). He found no evidence of weight loss or a wasting disease (R. 514). Dr. Hershow listed various medications and their relative doses but no

associated side-effects (R. 515). He found her depression to be "severe," that she "frequently" experienced pain, fatigue, or symptoms severe enough to interfere with attention and concentration, and that she is incapable of even a low-stress job (R. 516). Dr. Hershow opined that Ms. Perry was limited to lifting no more than 10 pounds, sitting no more than two hours out of an eight-hour work-day, and standing/walking no more than one hour out of an eight-hour work-day (R. 515).

That same day, Ms. Perry also received an annual gynecological exam (R. 642-43). The gynecological report from that visit reflects that she had she underwent a "surveillance" Pap smear and was instructed to schedule an ultrasound to evaluate left adnexal fullness (R. 643). The note also states that she has asymptomatic HIV (*Id.*).

An infectious disease note completed on December 7, 2010 memorializes a meeting between Maria Schwarber, RN, and Dr. Hershow relative to Ms. Perry's November 10, 2010 lab results, as well as Nurse Schwarber's subsequent telephone conversation with Ms. Perry requesting that she return to the clinic for medication management (R. 654). Ms. Perry stated that she was in Detroit and could not return to Chicago until later in the month (*Id.*). She denied nausea, vomiting, diarrhea, or any other problems, and she further stated that she had not started her HIV medications as instructed because she "couldn't afford it" (*Id.*).[10]

---

[10]The record contains only limited information pertaining to Ms. Perry's prescription medication history, and the information that does exist pertains only to Dr. Sadek. Records between February 17, 2009 and April 27, 2010 indicate that she regularly filled prescriptions at Sharif Pharmacy in Chicago (R. 759). For example, she filled her Lexapro prescription eight times during that time frame at a cost of $3.00 per refill (30 day supply) (*Id.*). She likewise filled her Seroquel prescription (30 day supply) eight times during that time frame at no cost (*Id.*). The only medications that occasionally carried any cost whatsoever were Lexapro and Cymbalta at $3.00 per refill (*Id.*). As for Ms. Perry's HIV medication history, the record reveals that she told Dr. Burgos in September 2010 that she still had medication left over from her IDPA card (*see* footnote 9 above). Dr. Burgos noted in a treatment note addendum dated November 17, 2010 that Ms. Perry had received approval from ADAP and that, consequently, a medication prescription had been sent to CVS pharmacy (R. 646). He also left a week's worth of medication for her in the clinic's refrigerator (*Id.*).

Ms. Perry saw Dr. Hershow again on January 18, 2011, and told him that "much had improved" in her life since her last visit on November 23, 2010 (R. 749). She reported "feeling at peace" and claimed an improved relationship with her mother, continued abstention from alcohol, adherence to her HIV medication regime, and a cessation of headaches, but also a flare-up of sciatica that "comes and goes" (R. 748-50). In an addendum dated February 8, 2011, Dr. Hershow added to the record that Ms. Perry's viral load was "elevated at 33,356 despite avowed excellent adherence at last visit. CD4 cell count has decreased to [the] 400 range. Will question carefully about adherence at next visit, and check genotype study" (R. 752).

Finally, the medical record contains a letter from Dr. Hershow dated March 11, 2011 and addressed to Ms. Perry's attorney for inclusion in the medical record (R. 782-83). In this letter, which served to affirm and clarify the contents of his HIV Questionnaire, Dr. Hershow stated that he did not have any equipment in his office with which to objectively assess Ms. Perry's ability to sit, stand, and walk for specific lengths of time (R. 782). Instead, he assessed these capabilities by interviewing Ms. Perry and then coupling her responses with his own assessment (*Id.*). Using this methodology, Dr. Hershow confirmed his conclusion that Ms. Perry's impairments, as documented in the HIV Questionnaire, remained accurate (*Id.*). He further reported that he had met with Ms. Perry on May 9, 2011 and that she told him she had not taken her psychiatric medications for two months because she could not afford them, thus leading to a continuation, or a worsening, of her depression (*Id.*). Ms. Perry further reported days when she could not get out of bed, stand for long periods, or carry "weights" (*Id.*). Dr. Hershow's letter also referred to a May 11, 2011 appointment, at which Ms. Perry was noted to have lost 11 pounds (*Id.*). Dr. Hershow then stated that although "it is difficult to differentiate depression-

related fatigue from HIV-infection-related fatigue," her recent weight loss supported his "sense of worsening fatigue and generalized weakness for this patient" (*Id.*).

**D.**

On December 1, 2010, the ALJ conducted a hearing at which Ms. Perry, her counsel, and a medical expert were present (R. 169-76). The ALJ expressed displeasure with the incompleteness of the medical record and admonished counsel to get the record completed (R. 169-70). The ALJ questioned Ms. Perry regarding her current doctors, to which she responded that she is under the care of Dr. Sadek for her depression and Dr. Hershow for her HIV (R. 170-71). She explained that she no longer cares for her two sons and that she is unemployed (R. 173-74). The ALJ then concluded the hearing pending collection of the remaining records.

On March 7, 2011, the ALJ conducted a second hearing attended by Ms. Perry, a vocational expert, and a medical expert (R. 116-66). The ALJ again lamented the incompleteness of the medical record, noting in particular the paucity of notes provided by Dr. Sadek's office and the implication that, based on the few notes provided, he treated her only about five times in total (R. 121-22). The ALJ then turned to questioning Ms. Perry, who stated that she is 39 years-old, has a bachelor's degree, lives with her mother, and is currently unemployed (R. 136-37). She earned a significant salary at Cash America as a manager in the mail collections center until she was terminated for failure to perform her role—a failure she attributed to her mental condition and to not being able to "hold it together" (R. 138-39). She also worked for Harvard Collection Services as a manager, but again was discharged (R. 139). She explained that her mental condition is the main problem, not her HIV condition, although her physical health problems, combined with her husband's decision to leave the family around 2007, caused her to go "downhill" (R. 144). She then started having problems getting along with

co-workers and supervisors, had a hard time concentrating at work, and started making mistakes on the job (R. 154-56). She explained that she started having severe symptoms in 2008 but waited until 2009 to apply for disability benefits because she thought she could overcome her problems (R. 153-54).

On a daily basis, Ms. Perry stays at home and does "[b]asically nothing" (R. 148). She watches TV or looks out the window but does not read books, cook, or do laundry (R. 148-50). She does not drive because her medications make her sleepy (R. 144). She gets tired and light-headed if she walks more than three blocks (R. 151-52). She does not have any friends because she does not want to be around people and does not want to explain her feelings (R. 154). Her mother does not trust her to be alone and, in fact, hired a health care nurse two and a half years ago to stay with her during the day (R. 149).

Ms. Perry testified that she began seeing Dr. Sadek in or around the beginning of 2009, but not earlier because she did not think there was anything wrong with her (R. 157). She acknowledged gaps in her psychiatric medication refill history but explained that she did not always have a medical card and/or lacked funds—although sometimes her mother paid for her medications (R. 145-46). The ADAP program, which provides HIV medication, does not pay for psychiatric medications and therefore she is still sporadic in taking her medications (R. 147-48). She explained that although the record contains only a few medical notations, she sees Dr. Sadek every few months (R. 142-43).[11] She explained that she receives treatment for her HIV every three months, although she acknowledged a gap in those treatments, as well, caused again by not having a medical card (R. 124-25, 137). She stated she has been HIV positive for "over five years" and that she has many side effects from her various medications, including nausea,

---

[11]At the hearing, Ms. Perry's non-attorney representative blamed Dr. Sadek and St. Mary's Hospital for failing to supply all the records (R. 123-24).

vomiting, fatigue, and anxiety (R. 138-40). Regarding her hospitalizations, Ms. Perry testified that every hospitalization was a suicide attempt (R. 140). She denied alcohol use and stated that she stopped using marijuana in 2010 (R. 141-43).

The medical expert, Dr. Ellen Rozenfeld, testified next, largely by reviewing the medical record and then asking Ms. Perry about inconsistencies she found to exist between the record and Ms. Perry's testimony. For instance, Dr. Rozenfeld queried Ms. Perry as to whether she actually started school (she did not) and about her trip to Tennessee, which Dr. Hershow called a vacation but Ms. Perry described as a trip taken to prevent her from being alone (R. 158-60). Dr. Rozenfeld also pointed out that Dr. Sadek's records are illegible and incomplete, and that Dr. Hershow's records also appeared incomplete (R. 161-66). The ALJ then decided once again to carry over the hearing to a later date to allow time to compile additional medical records.

The ALJ held a third hearing on June 8, 2011, that was attended by Ms. Perry (now represented by counsel), as well as Dr. Rozenfeld and vocational expert Thomas Dunleavy (R. 44-115). At this hearing, the ALJ questioned Ms. Perry regarding her HIV medications and about gaps in her medication regime (R. 53). Ms. Perry again stated that she was diagnosed with HIV five years earlier and that she had not always been compliant with her medications because she lacked the proper medical card (R. 54). She testified that she has not used alcohol or drugs since 2008 or 2009 (R. 56, 65). She denied that she was drinking in 2010, regardless of what the medical records reflect (R. 65). Ms. Perry stated she can use a microwave to prepare meals but does not use the stove because she has left it on in the past (R. 57-58). She does a little light cleaning and can groom herself (R. 58-59). She experiences great fatigue, sleeps poorly and in "spurts," and takes three to four naps a day for up to two hours at a time (R. 59, 69). Ms. Perry does not go to any HIV support groups or any social groups and only leaves the house about

once a week for a doctor's appointment or to see her younger son (R. 60, 62). She can lift a gallon of milk with her right hand and can sit for 30 to 45 minutes before she begins to feel restless (R. 63). Ms. Perry has occasional panic attacks (R. 65). She denied having any friends outside of her mother and her godfather, Anthony, who lives in Detroit and often drives her back and forth between Detroit and Chicago (R. 64, 67).

Ms. Perry's attorney questioned her regarding her hospitalizations for depression. She denied ever being an alcoholic but that she did have a desire "to take [herself] from here" through a combination of alcohol and pills (R. 66). She acknowledged that her hospitalization in March 2010 was a suicide attempt, although she denied that alcohol was a factor (R. 65). She admitted that alcohol was a factor in her November 2009 hospitalization (R. 66). She still struggles with suicidal ideation on a daily basis (R. 67). She feels she cannot focus on anything, such as a TV show, because her thoughts take over and she tries to "rationalize" what has happened to her (*Id.*). Regarding her HIV medications, Ms. Perry complained that they cause fatigue, dry mouth, vomiting, and diarrhea (R. 68). She is fearful of her HIV because it was undetectable for a long time but now it seems her body is not responding to her medications (R. 70). She stated that her mental health has gotten worse (*Id.*). When asked about Dr. Hershow's note indicating she had gotten engaged and was feeling less depressed, Ms. Perry responded that she is not currently engaged and that her boyfriend broke off their relationship when he learned of her HIV status (R. 71, 73). She had not mentioned him earlier because they no longer communicate (R. 73).[12] Regarding the lack of medical records from Dr. Sadek, Ms. Perry testified that she did not see him often because she had trouble with her medical card arising from when her son moved in with his dad, thus terminating her own eligibility (R. 96). She

---

[12]The medical record indicates that Ms. Perry brought her fiancé with her to an October 4, 2011 appointment with Dr. Hershow—a few months after this hearing took place (R. 787).

explained that she did not have the money to fill the prescriptions Dr. Sadek wrote for her (R. 97).

Medical expert Dr. Rozenfeld testified again regarding Ms. Perry's medical record. She stated that Ms. Perry has been diagnosed with major depression, cannabis abuse, and alcohol abuse (R. 74). She noted numerous positive toxicologies for benzodiazepines and opiates, and she also noted inconsistencies between Ms. Perry's testimony of abstinence and the medical records from November 2009 and March 2010 showing alcohol intoxication, positive toxicology tests for marijuana, binge drinking, and Dr. Hershow's observation that Ms. Perry smelled of alcohol (R. 74-75). Dr. Rozenfeld cast doubt on Ms. Perry's testimony that every hospitalization was a suicide attempt since the discharge notes from her one-day November 2009 hospitalization indicate alcohol intoxication, not suicide attempt, as the final diagnosis (R. 75). Dr. Rozenfeld highlighted the infrequency with which Ms. Perry sought psychiatric care, and she also doubted the severity of Ms. Perry's depression (R. 79). She opined that Ms. Perry does not meet or equal a listing for depression as her depression was not "at a level that would preclude competitive employment" (*Id.*). In sum, Dr. Rozenfeld found no more than a moderate limitation with respect to activities of daily living, social functioning, and concentration, persistence, or pace (R. 81). Dr. Rozenfeld opined that Ms. Perry could perform a job that lacked sustained general public contact, involved no joint or shared tasks with co-workers, and that occurred in a predictable setting with only routine changes (R. 86-87).

Finally, the vocational expert ("VE") testified that Ms. Perry's previous jobs fell within the classification of skilled, light work (R. 108). The ALJ then presented the VE with a sedentary residual functional capacity ("RFC") hypothetical involving a worker who would need to be able to stand/walk for two hours of an eight-hour work day, sit for six hours, and perform

unlimited pushing or pulling and unlimited posturals, but who would be subject to the following mental limitations: simple and routine work, incidental public contact, no joint tasks with co-workers, limited supervision, and a routine and predictable environment (R. 109). With these limitations in place, the VE opined that the hypothetical worker would not be able to perform Ms. Perry's past relevant work but that she could work as an assembler, sorter, or table worker (*Id.*). Moving then to a light RFC, the ALJ presented the VE with a hypothetical where the worker would need to be able to stand/walk for six hours, sit for six hours, and perform unlimited pushing or pulling but no other physical limitations, and would be subject to the same mental limitations as the earlier hypothetical (R. 110). With these limitations in place, the VE opined that the hypothetical worker could work as a housekeeper or cafeteria attendant (R. 111). For the sedentary jobs, the VE stated that the worker would need to stay on task 90 percent of the time, compared to 85 percent of the time for the light jobs (*Id.*). Absences should not exceed 10 days per year and should not occur more than once during the first 90-day period of work (*Id.*). A person who is too fatigued to show up to work for at least 37.5 hours a week, depending on the job, or who needs to lie down for one to two hours a day during the work day, is not capable of competitive employment (R. 112-13).

### E.

On July 26, 2011, the ALJ issued a 13-page, single-spaced written opinion finding Ms. Perry not disabled pursuant to sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act and consequently denying her benefits (R. 23-36). In evaluating her claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's RFC before moving on to Step 4. *See* 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to her past work or different available work in the national economy. *See* 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ found that Ms. Perry has not engaged in substantial gainful employment since her alleged onset date of January 17, 2008 through her date last insured of December 31, 2012 (R. 23, 25). At Step 2, she found that Ms. Perry's HIV, depression, and alcohol abuse (in reported remission) qualified as severe impairments but then found at Step 3 that these impairments did not meet or medically equal any of the impairments listed in the Listing of Impairments (R. 25-26). The ALJ then found at Steps 4 and 5 that although Ms. Perry could not perform her past relevant work, she had the RFC to perform the tasks required of an assembler or sorter (R. 34-35). Accordingly, the ALJ found Ms. Perry not disabled.

In arriving at this conclusion, the ALJ agreed that Ms. Perry experienced one or two episodes of decompensation and suffers moderate restrictions as to her activities of daily living and social functioning (R. 26). She noted that Ms. Perry takes various HIV medications that cause drowsiness and may affect her daily activities (*Id.*). The ALJ found Ms. Perry to have moderate difficulties with respect to concentration, persistence, or pace caused by substance abuse and depression (*Id.*). However, the ALJ seriously doubted the credibility of Ms. Perry's

testimony concerning the extent of her limitations. She found inconsistencies between the medical record and Ms. Perry's allegations of sobriety, inconsistencies between the medical record and Ms. Perry's allegations of continual suicidal ideation, inconsistencies between Ms. Perry's alleged need for full-time supervision and her pattern of going to Detroit to see her fiancé or godfather, and inconsistencies between her allegations of fatigue and other HIV-related symptoms and her sporadic treatment records with Dr. Hershow that also portray an absence of major symptoms (R. 30-31).

In reviewing the opinion evidence, the ALJ considered but gave very little weight to the opinions of treating physicians Dr. Hershow and Dr. Sadek (R. 31-33). She found that Dr. Hershow could not be confident in his assessment of Ms. Perry's condition given the large gaps in treatment, and she further concluded that his opinion was unsupported by the objective medical evidence, including his own treatment notes (R. 32). Similarly, the ALJ gave little weight to Dr. Sadek's opinion based on the illegibility of his notes, the gaps in treatment, and a lack of consistency between the objective medical record and Dr. Sadek's findings of marked limitations in 14 out of the 20 categories listed in his Psychiatric/Psychological Impairment Questionnaire (R. 33). The ALJ also raised the possibility that both Drs. Hershow and Sadek may have expressed opinions about the severity of Ms. Perry's condition that were out of scale with the medical record in an effort to help her achieve disability status (R. 32-33). She gave "less weight" to the opinion of DDS physician Dr. Rizzo, but for the opposite reason: she felt that Dr. Rizzo underestimated the extent of Ms. Perry's depression (*Id.*). Finally, the ALJ afforded great weight to the opinions of Dr. Rozenfeld based on her review of the medical record, her presence during the hearings, and her ability to question Ms. Perry (R. 33). The ALJ

20

then concluded that Ms. Perry has the RFC to perform sedentary work with certain mental health limitations (R. 27).

**F.**

In response to the ALJ's decision, Dr. Hershow submitted a letter to the Appeals Council dated November 29, 2011 in which he expressed his medical opinion that Ms. Perry is significantly disabled by fatigue, depression and sciatica (R. 785-86). Dr. Hershow acknowledged that he is an infectious disease doctor but stated that psychiatric co-morbidities like depression are common among his patients (*Id.*). Dr. Hershow noted that Ms. Perry had lost 22 pounds since April 2010 and that this weight loss is an objective finding related to her HIV (R. 786). He strongly denied any implication that he "altered his medical opinion to assist" Ms. Perry (*Id.*).

Dr. Hershow also submitted to the Appeals Council notes from two additional clinic visits in the fall of 2011. At the first visit, in October 2011, Ms. Perry brought her fiancé to her appointment and reported that he had been helping her with medication adherence and abstention from alcohol (R. 788). Ms. Perry reported fatigue, nausea, and vomiting following the addition of a new medication but wanted to remain on the medication (*Id.*). She also stated that she had discontinued her psychiatric medications for financial reasons (*Id.*). Dr. Hershow noted that Ms. Perry had lost 11 pounds, that she spends most of her time in Michigan, and that while she reported excellent compliance with her medication, her viral load levels were higher (*Id.*). He noted depression as a major issue and likely continued alcohol abuse (R. 791). At the second visit, in November 2011, Ms. Perry arrived alone to her appointment and reported ongoing depression, fatigue, sciatic pain, and intermittent nausea and vomiting (R. 794). Dr. Hershow

noted that her viral load remained uncontrolled and suspected non-compliance with medications as the cause (*Id.*).

## III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Ms. Perry contends that the ALJ erred in failing to follow the "treating physician rule," failing to properly evaluate her credibility, and improperly relying on flawed vocational expert testimony. Ms. Perry also contends that the Appeals Council erred in failing to remand the case back to the ALJ based on new evidence. For the reasons stated below, we disagree and find that substantial evidence supports the ALJ's decision. We also find no error with respect to the Appeals Council's refusal to remand the case to the ALJ.

## A.

Ms. Perry first argues that the ALJ improperly afforded little weight to the opinions of her treating physicians, Dr. Hershow and Dr. Sadek. We will address each in turn.

**1.**

Infectious disease physician Dr. Ronald Hershow periodically examined Ms. Perry between 2007 and 2011. Dr. Hershow's treatment notes indicate that Ms. Perry suffers from HIV, depression, fatigue, a history of alcohol dependency, and an assortment of other ailments, including sciatica. He opined in his November 2010 HIV Questionnaire and a subsequent March 2011 letter that Ms. Perry is unable to maintain employment in even a "low-stress" job due to her depression and fatigue. The ALJ, however, granted Dr. Hershow's opinion very little weight, concluding that his findings largely were based on Ms. Perry's subjective complaints, were unsupported by the treatment notes, were plagued by frequent gaps in treatment, and possibly were influenced by doctor bias. Ms. Perry now argues that the ALJ failed to observe the "treating physician rule" (doc. # 16: Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem.") at 12-14), while the Commissioner counters that the ALJ properly rejected Dr. Hershow's opinion because it was based on Ms. Perry's exaggerated and subjective allegations (doc. # 24: Commissioner's Motion for Summary Judgment ("Def.'s Mem.") at 4-6).

As a treating source, Dr. Hershow's opinion is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ may discredit a treating source's medical record, however, if it is internally inconsistent or inconsistent with the opinion of a consulting physician—provided the ALJ minimally articulates her reason for crediting or rejecting evidence of disability. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). A decision to deny controlling weight to a treating source's opinion does not prevent the ALJ from

considering it; the ALJ may still look to the opinion, even after opting to afford it less evidentiary weight. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician's and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3), (c)(5); *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (setting forth factors to be considered in evaluating the weight given to a doctor's opinion).

The relevant issue here is whether the ALJ articulated sufficient reasons for discounting the weight assigned to Dr. Hershow's medical opinions. The Court finds that she met this standard.

*First*, the ALJ found inconsistencies within Dr. Hershow's 2009 Psychiatric Report and 2010 HIV Questionnaire that undermined her confidence in the doctor's conclusion that Ms. Perry is severely limited (R. 31). In the 2009 Report, Dr. Hershow stated that depression and alcohol were problematic in terms of Ms. Perry's ability to master task completion, understand and remember instructions, and work with supervisors and co-workers; yet in this same report, Dr. Hershow stated that Ms. Perry had an appropriate mental status, coherent speech, logical thought processes, no delusions, and was oriented to time, person, and place (*Id.*). And, in his 2010 HIV Questionnaire, although Dr. Hershow listed Ms. Perry's condition as "guarded" and noted numerous diagnoses and clinical complications, he also noted a complete absence of any "bacterial or fungal infections, heminthic infection, viral infection, weight loss or wasting" associated with HIV disease (R. 32).

*Second*, the ALJ found that Dr. Hershow's treatment notes did not support the restrictive findings recommended in the November 2010 HIV Questionnaire, stating that: "[t]he treatment

notes do not reflect significant, on-going complaints of fatigue, etc.; the doctor did not order any

aggressive treatments; and claimant's objective test results were satisfactory" (R. 32). The ALJ

observed that Dr. Hershow did not have any equipment with which to measure Ms. Perry's

ability to lift, sit, stand, or walk, and that he instead assessed her overall level of debilitation and

fatigue, in part, on self-reported complaints (R. 32). The ALJ was within bounds in employing

this analysis: as the Seventh Circuit has commented, "subjective complaints are the opposite of

objective medical evidence and, while relevant, do not compel the ALJ to accept [the doctor's]

assessment." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). The ALJ also observed

relatively contemporaneous treatment notes indicating that Ms. Perry was feeling well—most

notably the treatment note from January 18, 2011, just two months after completion of the HIV

Questionnaire—wherein Ms. Perry reported that she continued to abstain from alcohol, was

feeling "at peace," and that her headaches and blurry vision had completely resolved (R. 32).[13]

*Third*, the ALJ suggested that Dr. Hershow's two reports bore the hallmark of a treating

physician who was "bending over backwards" to help his patient obtain benefits. While

admitting that it is "difficult to confirm the presence of such motives," the ALJ observed that

"they are more likely in situations where the opinion in question departs substantially from the

rest of the evidence of record, as in the current case" (R. 33). Although Ms. Perry and Dr.

Hershow both strongly deny any such bias, this is a permissible basis upon which an ALJ may

deny controlling weight to a treating source. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.

2007) (noting that "the patient's regular physician may want to do a favor for a friend and client,

and so the treating physician may too quickly find disability"); *Hofslien v. Barnhart*, 439 F.3d

375, 377 (7th Cir. 2006) (noting that "the fact that the claimant is the treating physician's patient

---

[13]In addition, we note that the medical records prepared on November 23, 2010 (the date of the HIV
Questionnaire) also reported that Ms. Perry had no weight loss or wasting disease and no side-effects from her
medication (R. 514-15).

also detracts from the weight of that physician's testimony, since, as is well known, many physicians . . . will often bend over backwards to assist a patient in obtaining benefits").

Ms. Perry raises several arguments in support of her position that the ALJ erred in not giving Dr. Hershow's opinions controlling weight, but none are availing. First is Ms. Perry's contention that the ALJ rejected Dr. Hershow's opinion based on gaps in treatment but failed to consider her financial and insurance situations—a position she claims contravenes SSR 82-59. (Pl.'s Mem. at 13). But SSR 82-59 does not advance her case. This social security policy statement addresses and "describe[s] the criteria necessary for a finding of failure to follow prescribed treatment" in cases where following a prescribed treatment could be expected to restore a claimant's ability to work. SSR 82-59, 1982 WL 31384, at *1 (S.S.A 1982); *see also Boydston v. Colvin*, No. 12-cv-3310, 2014 WL 274156, at *12 (C.D. Ill. Jan. 24, 2014) (finding that "SSR 82-59 applies when an ALJ determines that a person is disabled because he failed to follow recommended treatment"); *Wilkins v. Colvin*, No. 12 C 0078, 2013 WL 5549551, at *6 (N.D. Ill. Oct. 7, 2013) (noting the inapplicability of SSR 82-59 where the ALJ determined that the claimant does not have a disabling impairment). Here, the ALJ found that gaps in the treatment record undermined Dr. Hershow's ability to make confident assessments regarding Ms. Perry's self-reported behaviors, and the ALJ also inferred from these same treatment gaps that perhaps Ms. Perry's symptoms were not as severe as alleged (R. 31). The ALJ found further support for this inference from the fact that when Ms. Perry did return for treatment, she showed "no major symptoms" (*Id.*). Critically, then, the ALJ did not find that Ms. Perry is disabled because she failed to follow her doctors' treatment recommendations. Instead, she found Ms. Perry not disabled because, despite her severe impairments, she retained an RFC that allows her

to perform sedentary work with certain mental health limitations. Accordingly, this Court finds SSR 82-59 to be inapplicable to the facts of this case and the argument to be without merit.[14]

Also unavailing is Ms. Perry's contention that Dr. Hershow's opinions as to her physical RFC are uncontradicted and thus entitled to controlling weight (Pl.'s Mem. at 13). An ALJ may reject a physician's opinion where it lacks the support of medically acceptable evidence. *See Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995) (finding that a treating physician's opinion is not conclusive in assessing disability status when unsupported by medically acceptable clinical or diagnostic evidence). Here, the ALJ rejected the physical findings in Dr. Hershow's HIV Questionnaire as unsupported by objective medical findings. As for Ms. Perry's assertion that the ALJ failed to consider Dr. Hershow's diagnostic evidence regarding her T-Cell and CD4 counts, we find that the ALJ recognized Ms. Perry's HIV status (as confirmed by these diagnostic markers), stating: "[d]espite the sporadic treatment and the fact that the HIV has been asymptomatic, the undersigned is respectful of the claimant's HIV status and, in giving her every benefit and consideration, has reduced her physical residual functional capacity to the sedentary level" (R. 29).

Finally, Ms. Perry's contention that the ALJ failed to discuss every factor listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6) is unpersuasive. The ALJ did discuss the length and nature of the treatment relationship, and she also discussed how Dr. Hershow's opinions were not supported by his treatment notes. This was sufficient. An ALJ

---

[14]Even if the ALJ had made a finding of disability based on the failure to follow prescribed medical treatment, the Court notes that Ms. Perry's argument still must fail because the ALJ did in fact assess Ms. Perry's chief reasons for failing to take her HIV medications consistently: lack of financial resources and/or a medical card. The ALJ did not credit Ms. Perry's explanations, noting: "there are many sources of free HIV/AIDS medical care in Cook County. As such, any allegations or testimony by the claimant that she had not sought treatment due to the loss of her medical card are not very credible" (R. 31). We note as well that there is other evidence that Ms. Perry's assertions may overstate the consequence of the loss of her medical card on the availability of HIV medications (*see* footnotes 9 and 10 above).

need not recite and weigh every factor set forth in § 404.1527 and § 416.927. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Schmidt*, 496 F.3d at 842 (finding that an ALJ may discount a treating physician's opinion for various reasons, provided he "minimally articulates" his reasons).

**2.**

Psychiatrist Dr. Hisham Sadek is also a treating source physician who examined and treated Ms. Perry between December 2008 and February 2011. He diagnosed her with major depression, rated her "moderately" or "markedly" limited in numerous cognitive and social interaction categories, and deemed her incapable of even a "low stress" job due to chronic mental illness. The ALJ discredited Dr. Sadek's opinion, however, finding that "the objective medical evidence of record does not support the extreme findings" (R. 33). The ALJ further noted that Ms. Perry saw Dr. Sadek only some six to eight times over a three-year period, and observed that "if the claimant were so extremely limited, the record would show much more aggressive treatment and medication management. Instead, it is clear that the claimant did not return for treatment to this doctor on a consistent basis" (*Id.*). The ALJ noted that Dr. Sadek's treatment notes were largely illegible, and the ALJ also took into account the possibility that he excessively sympathized with Ms. Perry and sought to help her by providing an extreme report regarding her limitations (*Id.*).

Ms. Perry now argues that the ALJ failed to properly credit Dr. Sadek's opinions, failed to consider the checklist factors set forth in § 404.1527(c) and § 416.927(c), and failed to consider Ms. Perry's poor mental health and financial resources as legitimate reasons underlying her infrequent mental health treatment record (Pl.'s Mem. at 15-16). The Commissioner

maintains that the ALJ properly accepted the testimony of Dr. Rozenfeld over the opinions of Dr. Sadek (Def.'s Mem. at 7).

Once again, as a treating source, Dr. Sadek's opinion is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). And once again, the relevant issue here is whether the ALJ sufficiently articulated acceptable reasons for placing diminished weight on Dr. Sadek's report. The Court finds that she did.

First and foremost, the ALJ found that the level of Ms. Perry's restrictions that Dr. Sadek expressed in his Psychiatric Impairment Questionnaire and the June 23, 2010 form letter were not supported by the treatment notes. Although the illegibility of Dr. Sadek's treatment notes was itself a problem, the ALJ worked around it by having medical expert Dr. Rozenfeld on hand during the hearings to review the medical record and ask Ms. Perry questions regarding her condition. Dr. Rozenfeld found an absence of documentation regarding decompensation, a very infrequent overall treatment record that Dr. Rozenfeld found inconsistent with a disabling condition, and medical records demonstrating that Ms. Perry reported doing better, getting engaged, and traveling. The ALJ was permitted to rely on Dr. Rozenfeld's opinion—despite the fact that she is not a treating physician—because she had access to, and reviewed, the entire medical record. *See Micus v. Bowen,* 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence") (citing *Stephens v. Heckler,* 766 F.2d 284, 289 (7th Cir.

1985)). In sum, the ALJ permissibly relied on Dr. Rozenfeld's opinion in concluding that the objective medical record, and Dr. Sadek's very limited treatment record, failed to support Dr. Sadek's assessment. *See Knight*, 55 F.3d at 314 (finding that "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record).

None of Ms. Perry's remaining arguments gain traction here, either. As noted above, the ALJ was not required to elaborate upon all of the factors set forth in § 404.1527(c) or § 416.927(c). The ALJ discussed the length and frequency of the treatment relationship and explained that the "although the doctor does have a treating relationship with the claimant, the record reveals that actual treatment visits have been relatively infrequent" (R. 33). The ALJ commented that "if the claimant were so extremely limited, the record would show much more aggressive treatment and medication management." *See Back v. Barnhart*, 63 Fed. App'x 254, 259 (7th Cir. 2003) (noting that the ALJ is permitted to "point[ ] out examples of the kinds of objective evidence one might expect to see if [the claimant] had the limitations he claimed").

Ms. Perry also asserts that the ALJ failed to consider her poor financial resources and/or her mental health status as an important aspect of her infrequent mental health visits (Pl.'s Mem. at 15). However, what this argument ignores is that the question of whether Ms. Perry's infrequent visits to Dr. Sadek were caused by a lack of financial resources or instead by her medical condition rests upon a threshold assessment of her credibility. As we explain further in Section B below, the ALJ found, with sufficient basis, serious problems with Ms. Perry's credibility. The ALJ found Ms. Perry to be "less than forthcoming" in her testimony about her fiancé, the reasons for her trips out of state, and her contention that she had to be supervised at all times. The ALJ noted instances in which the medical record recorded Ms. Perry's ability to take public transportation alone and to attend doctors' appointments without supervision. The

ALJ noted that Ms. Perry's complaint of great fatigue (Ms. Perry testified that she napped three to four times a day for one and a half to two hours a time) was inconsistent with her monthly travel out of state. The ALJ noted as well that there are many sources of free HIV/AIDS medical care in Cook County. The ALJ was entitled to use these considerations, among the others she cited, to conclude that Ms. Perry's sporadic treatment history with Dr. Sadek was primarily the result of Ms. Perry's medical health being less severe than portrayed.

**B.**

Ms. Perry also alleges that the ALJ erred in assessing her credibility and in discounting her testimony about the severity of her symptoms. In assessing a claimant's credibility when the allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. 1996); *Arnold v. Barnhart,* 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96–7p). The ALJ should look to a number of factors to determine credibility, including "the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Id.* (citing 20 C.F.R. § 404.1529(c)(2)-(4)).

Hearing officers are in the best position to evaluate a witness's credibility, and their assessment will be reversed only if "patently wrong." *Schaaf,* 602 F.3d at 875 (7th Cir. 2010); *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). That means that this Court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and that Ms. Perry "must do more than point to a different conclusion that the ALJ could have reached." *See Jones*

*v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Still, an ALJ must connect his credibility

determinations by an "accurate and logical bridge" to the record evidence. *Sarchet v. Chater*, 78

F.3d 305, 307 (7th Cir. 1996); *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006); *see also*

*Sayles v. Barnhart,* No. 00 C 7200, 2001 WL 1568850, at *7 (N.D. Ill. Dec. 7, 2001) (Schenkier.

J.) (finding a particular need to establish logical bridge in credibility determinations).

      With these standards in mind, we turn to Ms. Perry's first argument: that the ALJ applied

an improper legal standard during the credibility determination by using the following boilerplate

language:

> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected to
> cause the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not credible to
> the extent they are inconsistent with the above residual functional capacity
> assessment.

(R. 29). The Seventh Circuit has criticized this very language as getting "things backwards,"

because an ALJ is required to make an independent credibility determination before assessing

the claimant's ability to work. *See Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012).

But the Seventh Circuit also has clarified that an ALJ's use of this undesirable language does not

amount to reversible error if she "otherwise points to information that justifies his credibility

determination." *See Pepper*, 712 F.3d at 367-68. Thus, there is no sound basis to reverse

because of an ALJ's use of this language where she gave other reasons, sufficiently grounded in

evidence, to explain her credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th

Cir. 2012).

      In this case, the ALJ gave numerous reasons in support of her finding that Ms. Perry has

limited credibility. She noted inconsistencies between Ms. Perry's hearing testimony and facts

contained within the medical record. For example, Ms. Perry stated that she stopped drinking

and using drugs in 2008 or 2009, but the medical records clearly indicate continued alcohol and drug use in March of 2010 (R. 30). Ms. Perry claimed to have no friends, but Dr. Hershow's treatment notes suggest that Ms. Perry regularly split her time between Illinois and her godfather's/fiancé's home in Michigan (*Id.*). Ms. Perry also claimed to need constant supervision, but this assertion was undermined by evidence that she took public transportation on her own and that her travels to Michigan were not for purposes of "supervision" while her mother was out of town. Additionally, the ALJ noted inconsistencies between the medical record and Ms. Perry's allegations of "fatigue and HIV symptomology." The ALJ concluded that Ms. Perry's repeated failure to seek treatment from Dr. Hershow for extended periods of time indicated that her symptoms are not as severe as alleged. When the ALJ asked Ms. Perry about those gaps in treatment, she claimed to have no money, but the ALJ noted that there are many sources of free HIV/AIDS medical care in Cook County. While Ms. Perry does not agree with these assessments, an ALJ may use a combination of "objective evidence and common sense" to evaluate whether alleged symptoms establish an inability to work. *Castile v. Astrue,* 617 F.3d 923, 930 (7th Cir. 2010).

Even so, Ms. Perry contends that the ALJ's credibility determination placed undue emphasis on her ability to travel independently and to leave the state, impermissibly equated her occasional travel with an ability to work full-time, failed to adequately consider her activities of daily living, and failed to note her "lack of significant and sustained improvement with treatment" (Pl.'s Mem. at 21). But from this Court's viewpoint, the ALJ was very concerned with ensuring Ms. Perry a fair hearing based upon a complete medical record, as noted by her decision to reconvene the hearing twice in order to collect more evidence. All told, the ALJ spent roughly four hours with Ms. Perry at three separate hearings, and she then wrote a lengthy

opinion that addressed a great deal of the available medical record. Furthermore, the ALJ considered Ms. Perry's testimony regarding her activities of daily living and concluded that she has a moderate restriction in this area, in part because her numerous HIV medications cause her drowsiness (R. 26). The ALJ considered Ms. Perry's social functioning and concluded that she has moderate difficulties in this area notwithstanding the inconsistency between Ms. Perry's assertion that she has no friends or hobbies and her testimony (provided only upon follow-up questioning) regarding her fiancé and her travel to Michigan. The ALJ determined that Ms. Perry has moderate difficulties with respect to concentration, persistence, or pace, and based this conclusion on Ms. Perry's testimony that she has trouble concentrating, as well as on Dr. Rozenfeld's opinion that her "substance abuse history combined with depression, could cause decreased concentration" (R. 26). The ALJ also reviewed Dr. Sadek's and Dr. Hershow's reports at length. We conclude that the ALJ adequately considered the evidence and built a logical bridge from the evidence to her conclusion. The ALJ is not required to address every aspect of the medical record. *See Simila*, 573 F.3d at 516 (stating that "the ALJ is not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to her conclusions").

We find no merit to Ms. Perry's contention that the ALJ discounted the severity of her condition because she found Dr. Sadek's treatment recommendations to be "routine and conservative" (Pl.'s Mem. at 19). To this point, Ms. Perry cites the case of *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008), for the proposition that an ALJ may not "impose[ ] [her] [respective] notion [ ] that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered." In other words, simply because a claimant takes an aspirin or uses hot packs for back pain, instead of submitting to surgery or taking prescription

medication, does not necessarily mean that the claimant's condition is non-severe. *See Id.* In this case, however, the ALJ did not discount the severity of Ms. Perry's depression because of a lack of "intrusiveness" of her treatment plan, but rather because of a general lack of consistent treatment. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that the claimant's repeated failure to seek medical treatment reasonably factored into the ALJ's credibility analysis). There is a difference between consistently seeking care and adopting a non-intrusive treatment plan, and in sporadically seeking treatment. Furthermore, as noted in *Burgess*, "[t]he fact that a patient takes only over-the-counter medicine to alleviate her pain may, however, help to support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record, such as the opinions of other examining physicians." *Id.*; *see also Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (finding that "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding," provided the ALJ explores the claimant's explanations). Here, the ALJ considered not only the infrequency of care sought, but also frequent comments Ms. Perry made to Dr. Hershow stating that her depression had gradually lessened, that she was planning on going to school, and that she had improved upon her alcohol use with the help of her own will power and her fiancé's support. The ALJ also considered Ms. Perry's ability to travel frequently out of state to be inconsistent with her claims of debilitating depression.[15]

---

[15]Ms. Perry argues that her out-of-state travel should not be construed as indicative of an ability to work full-time, and cites in support numerous Seventh Circuit cases discussing how a claimant's ability to perform activities of daily living, such a cooking and bathing, should not necessarily be equated with being able to perform to the standards required by a full-time employer. *See, e.g., Moss*, 555 F.3d at 562; *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008). However, it strains the boundaries of these cases to equate Ms. Perry's frequent out-of-state travel with basic activities of daily living, such as grooming and basic food-preparation, particularly in this case where Ms. Perry's travel appeared to the ALJ to be motivated by wanting to be with her fiancé and not, as Ms. Perry maintained, out of a need to be fully supervised. The ALJ also noted that Ms. Perry's frequent travel was at odds with her complaints of debilitating depression and fatigue (including her stated need to nap numerous times each day for up to two hours at a time) and with her hearing testimony that she could not be left unattended, could not manage

Finally, we also find unpersuasive Ms. Perry's cursory argument concerning her drug and alcohol use. As Ms. Perry notes, the ALJ did not find her drug and alcohol use to be contributing factors material to the determination of disability. *See* 20 C.F.R. § 404.1535; 20 C.F.R. § 416.935. However, the ALJ still was permitted to weigh statements about substance use/abuse as part of her credibility determination. *See Underwood v. Astrue,* 430 Fed. App'x 532, 535 (7th Cir. 2011) (finding that the ALJ's credibility determination was supported by evidence where the ALJ noted inconsistencies in the claimant's testimony regarding her drug use, her psychiatric admissions, and her ability to care for her children).

In sum, the ALJ found that the "treating records paint a different picture [of Ms. Perry] than the testimony at the hearing," and she "resolve[d] the inconsistencies by giving greater weight to the statements made in the treatment context, rather than statements made for the purpose of a disability hearing" (R. 31). The ALJ found Ms. Perry to lack credibility as to the degree of her impairments, stating that she frequently provided "inconsistent or inaccurate information. . . [that] may not be the result of a conscious intention to mislead [but that] nevertheless . . . suggest that the information provided by the claimant generally may not have been entirely reliable" (R. 31). This Court may not reweigh the evidence to reach the conclusion that Ms. Perry prefers. *See Cunningham v. Barnhart,* 440 F.3d 862, 865 (7th Cir. 2006); *White v. Barnhart,* 415 F.3d 654, 659 (7th Cir. 2005). We conclude that the ALJ's credibility analysis is not "patently wrong." *See Elder,* 529 F.3d at 413-14 ("It is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong' and deserving of reversal").

---

public transportation, and had no friends and family (R. 30). We find no basis to conclude that the ALJ's determinations were "patently wrong."

## C.

Next, Ms. Perry argues that the Appeals Council improperly refused to review the ALJ's

decision following her submission of what she characterizes as "new and material evidence"

from Dr. Hershow. We review *de novo* the Appeals Council's decision to deny review of the

ALJ's decision. *See Farrel v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012). Where, as here, the

Appeals Council denied review on the grounds that the "information does not provide a basis for

changing the Administrative Law Judge's Decision" (R. 1-3), the Seventh Circuit has interpreted

this ambiguous language to mean that the Appeals Council rejected the additional information as

"non-qualifying under the regulations;" in other words, that the new information was neither

"new" nor "material." *Farrell*, 692 F.3d at 771.

> Bearing in mind this clarification, we look to 20 C.F.R. § 404.970(b), which provides:

> If new and material evidence is submitted, the Appeals Council shall consider the
> additional evidence only where it relates to the period on or before the date of the
> administrative law judge hearing decision. The Appeals Council shall evaluate the
> entire record including the new and material evidence submitted if it relates to the
> period on or before the date of the administrative law judge hearing decision. It
> will then review the case if it finds that the administrative law judge's action,
> findings, or conclusion is contrary to the weight of the evidence currently of
> record.

These requirements are similarly stated in the Hearings, Appeals and Litigation Law Manual

("HALLEX"), § I-3-3-6, which states:

> For the [Appeals Council] to consider additional evidence, the regulations require
> that the evidence is new, material, and related to the period on or before the date
> of the ALJ decision. This means the evidence is:
>
> 1. Not part of the claim(s) record as of the date of the ALJ decision;
>
> 2. Relevant, i.e., involves or is directly related to issues adjudicated by the ALJ;
> and

3. Relates to the period on or before the date of the ALJ decision, meaning it is: (1) dated before or on the date of the ALJ decision, or (2) post-dates the ALJ decision but is reasonably related to the time period adjudicated by the ALJ.

In this case, Ms. Perry maintains that Dr. Hershow's November 29, 2011 letter contains information that satisfies these three criteria, but the Court disagrees.

Much of Dr. Hershow's letter either reiterates findings from his pre-hearing treatment notes or provides updated information pertaining to Ms. Perry's HIV status and depression that post-date the ALJ's July 26, 2011 decision. Information falling in the former category is cumulative (and thus not "new" to the record), and information falling in the latter category is not reasonably related to the time period adjudicated by the ALJ. Furthermore, to the extent Dr. Hershow speaks of Ms. Perry's worsening sciatica, this information is not "material" as it is not directly related to the issues adjudicated by the ALJ. *See Schmidt v. Barnhart,* 395 F.3d 737, 742 (7th Cir. 2005). The ALJ did not find Ms. Perry's sciatica even to be a severe impairment, and Ms. Perry does not now argue that this conclusion was in error.

Regarding Dr. Hershow's assertion that Ms. Perry lost 22 pounds since April, 27, 2010, and Ms. Perry's argument that this constitutes a new, "objective finding supporting her complaints of fatigue and generalized weakness" (Pl.'s Mem. at 17), a quick review of the medical record indicates that these assertions do not withstand scrutiny. The medical records show that Ms. Perry weighed 50 kilos (110 pounds) on December 30, 2008 (R. 431), and 132 pounds on May 2, 2010 (R. 531). Dr. Hershow's November 23, 2010 report states that Ms. Perry weighed 129.5 pounds on that date. His HIV Questionnaire bearing that same date indicates that she suffered from neither weight loss nor wasting syndrome (R. 514). A January 18, 2011 treatment note recorded her weight as having diminished by only half a pound (R. 749). Finally, a letter from Dr. Hershow dated May 11, 2011 (in which he refers to a May 11, 2011 treatment

note) documents a weight loss of 11 pounds (*Id.*). At most, then, the evidence shows that during the relevant time period, Ms. Perry lost 11 pounds from her top weight of about 130 pounds. There is no reasonable probability that the ALJ would have reached a different conclusion had evidence of an 11 pound weight loss been considered. *See Schmidt*, 395 F.3d at 742 (finding that "[n]ew evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered") (quoting *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir.1999)). Any additional weight loss beyond these 11 pounds speaks only to the severity of Ms. Perry's condition after the ALJ's decision and thus does not relate to the adjudicated time period. *See Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008) (holding that postdated evidence of the claimant's worsening gout condition did not relate to the adjudicated time period).

The remaining aspects of Dr. Hershow's letter simply reflect his disagreement with the ALJ's decision. While Dr. Hershow "forcefully denied" the implication that his medical assessment was influenced by a desire to assist Ms. Perry, for the reasons we have explained above this was a consideration the ALJ was permitted to weigh. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (observing that "[w]e must keep in mind the biases that a treating physician may bring to the disability evaluation"). Furthermore, while Dr. Hershow reiterated his opinion that Ms. Perry is in fact disabled, we note that "[m]edical source opinions on issues reserved for the Commissioner" such as matters that "direct the determination or decision of disability," are not medical opinions at all and are not given any special significance. 20 C.F.R. § 404.1527(d)(1)-(3).

**D.**

Finally, Ms. Perry argues that the ALJ failed to include all of her limitations in the hypothetical presented to the VE. Ms. Perry contends that the hypothetical, which limits her to simple and routine work, incidental public contact, no joint tasks, limited supervision, and a routine and predictable environment, does not account for her moderate restrictions in the areas of activities of daily living, social functioning, and concentration, persistence, or pace (Pl.'s Mem. at 22). We disagree. The Seventh Circuit has held that "when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE." *Johansen v. Barnhart,* 314 F.3d 283, 289 (7th Cir. 2002) (finding that the ALJ's restriction to low-stress, repetitive work sufficiently incorporated the claimant's moderate mental limitations because the consulting physician "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could still perform low-stress, repetitive work"); *see also Meredith v. Bowen,* 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record."). Here, the ALJ relied on Dr. Rozenfeld to craft a "mental RFC," and Dr. Rozenfeld did so after taking into consideration her findings (based on a full review of the medical record, plus the opportunity to question Ms. Perry at length) that Ms. Perry had moderate limitations as to social functioning and concentration, persistence, or pace. The ALJ was permitted to rely on this RFC when presenting her hypothetical to the VE. Further, as to the physical element of Ms. Perry's RFC, we note that the ALJ limited her to sedentary work as an accommodation of her HIV status and allegations of fatigue. Ms. Perry raises no arguments regarding this finding.

To the extent Ms. Perry argues (though it is far from clear that she does) that the hypothetical failed to incorporate specific language such as "concentration, persistence, or pace," or otherwise failed to use specific language to delineate the full spectrum of Ms. Perry's limitations, the court finds that the VE demonstrated sufficient familiarity with the claimant's physical and mental restrictions so as to fully appreciate the extent of her limitations, regardless of any potential gaps in the hypothetical. The VE was present during the second and third hearings and thus heard virtually all of Ms. Perry's hearing testimony, as well as the testimony of Dr. Rozenfeld. The VE also had an opportunity to ask Ms. Perry questions regarding her prior work experience. The Seventh Circuit repeatedly has stated that where the VE independently learns of the claimant's limitations by hearing testimony or reviewing the medical record, the ALJ may "assume that the vocational expert included all of these limitations in his assessment of the number of jobs that the applicant can perform." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *see also O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (stating that "[w]e have not insisted, however, on a per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases. We sometimes have assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations"). We find this to be the case here, and for this additional reason, we find no error with the ALJ's hypothetical.

## CONCLUSION

For the reasons set forth above, the Court denies Ms. Perry's motion for summary judgment (doc. # 15) and grants the Commissioner's motion for summary affirmance (doc. # 23).

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: March 26, 2014**